**STATE OF LOUISIANA**
**COURT OF APPEAL, THIRD CIRCUIT**

**23-414**

**STATE OF LOUISIANA**

**VERSUS**

**TERRENCE ARMSTRONG**
**AKA TERRANCE ARMSTRONG**
**AKA DUGGA**

\*\*\*\*\*\*\*\*\*\*

**APPEAL FROM THE**
**NINTH JUDICIAL DISTRICT COURT**
**PARISH OF RAPIDES, NUMBER 358,446**
**HONORABLE GREG BEARD, DISTRICT JUDGE**

\*\*\*\*\*\*\*\*\*\*

**SHARON DARVILLE WILSON**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Sharon Darville Wilson, Charles G. Fitzgerald, and Ledricka J. Thierry, Judges.

**AFFIRMED.**

J. Phillip Terrell, Jr.
District Attorney
Lea R. Hall, Jr.
Assistant District Attorney
Ninth Judicial District Court
Parish of Rapides
State of Louisiana
Post Office Box 7358
Alexandria, Louisiana  71306-7358
(318) 473-6650
COUNSEL FOR APPELLEE:
    State of Louisiana

Sherry Watters
Louisiana Appellate Project
Post Office Box 58769
New Orleans, Louisiana  70158-8769
(504) 723-0284
COUNSEL FOR DEFENDANT/APPELLANT:
    Terrence Armstrong a/k/a Terrance Armstrong a/k/a Dugga

**WILSON, Judge.**

Defendant, Terrence ("Dugga") Armstrong, was convicted of the second degree murder of Edwin Davidson, a violation of La.R.S. 14:30.1. He was sentenced to a mandatory life sentence without the benefit of parole, probation, or suspension of sentence. Defendant appeals, seeking review of his conviction and sentence. For the reasons that follow, we affirm both his conviction and sentence.

## I.

## ISSUES

Defendant asserts the following assignments of error:

1. The charging document violates Defendant's "constitutional right and due process as it purports to be an indictment but was not properly filed."

2. The trial court violated Defendant's "right to a fair and impartial jury by keeping the juror on the jury despite his acknowledged violation of instructions and forcing the verdict, rather than ordering further deliberation, when a juror expressed doubt during polling."

3. The State failed to prove Defendant's guilt beyond a reasonable doubt "where the State's evidence of specific intent was insufficient."

4. The trial court erred in allowing the admission of "prejudicial other crimes evidence made in hearsay statements" and "irrelevant photographs of firearms."

5. The trial court erred in imposing "an excessive sentence that was not warranted by [] [D]efendant's minor role or the offender's history." Defendant received "ineffective assistance at sentencing where counsel did not file a motion for downward departure, did not object[,] and did not file a Motion for Reconsideration."

## II.

## ERRORS PATENT

We reviewed the record in accordance with La.Code Crim.P. art. 920 and found no errors patent in this case.

## III.

## FACTS AND PROCEDURAL HISTORY

Seventeen-year-old Davidson was killed[1] in a drive-by-shooting on October 20, 2020, in Alexandria, Louisiana, after he and Leon ("Lee Jack") Anderson (Anderson) allegedly shorted a purchase of Xanax by a group of Defendant's friends. That group consisted of Syria ("Kelsey") Mahfouz (Mahfouz), Pamela Smith (Smith), Blaine Milliman (Milliman), Kaitlyn Carlino (Carlino), Tyrone ("Noon") Compton (Compton), and Andrew Mayo (Mayo).

Defendant was charged with second degree murder. Following a jury trial in March of 2023, Defendant was convicted as charged and sentenced to a mandatory life sentence without the benefit of parole, probation, or suspension of sentence.

## IV.

## LAW AND DISCUSSION

*Sufficiency of the Evidence*

When a defendant raises issues on appeal regarding the sufficiency of the evidence and other trial errors, the reviewing court must first resolve the sufficiency issue. *State v. Hearold*, 603 So.2d 731 (La.1992). Accordingly, we address Defendant's third assignment of error first. He contends that the State failed to prove that he is guilty of second-degree murder beyond a reasonable doubt because there was insufficient evidence as to his specific intent and because the indictment charged him with both specific intent to commit murder *and* a murder committed during a drive-by shooting.

Appellate review of sufficiency of the evidence is well-settled:

---

[1] Dr. Yen Van Vo (Dr. Vo), the forensic pathologist who performed the autopsy, testified that the cause of death was a gunshot wound to the head. According to Dr. Vo, there was an irregular entrance wound with no stippling or soot, which was consistent with an object being between the muzzle of the gun and the surface of the victim's body.

2

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371

(citations omitted).

Second degree murder is defined in La.R.S. 14:30.1, which provides in

pertinent part:

A. Second degree murder is the killing of a human being:

(1) When the offender has a specific intent to kill or to inflict great bodily harm; or

(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated or first degree rape, forcible or second degree rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, second degree robbery, simple robbery, cruelty to juveniles, second degree cruelty to juveniles, or terrorism, even though he has no intent to kill or to inflict great bodily harm.

The definition of principals is set forth in La.R.S. 14:24:

All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.

In *State v. Tate*, 01-1658, pp. 7–8 (La. 5/20/03), 851 So.2d 921, 930 (citations

omitted), *cert. denied*, 541 U.S. 905, 124 S.Ct. 1604 (2004), the supreme court

discussed the mental element required to be found guilty as a principal:

Not all principals are automatically guilty of the same grade of the offense; thus, a principal may be charged with and convicted of a higher or lower degree of the crime, depending on the mental element proved at trial. An individual may be convicted only for those crimes for which

he personally has the requisite intent. It is not enough that his accomplice have the intent, the State must prove that the defendant had the required mental element.

Specific intent is a state of mind that may be inferred from the circumstances of the transaction and the actions of the accused. To establish specific intent the state must show that the defendant pulled the trigger, that he acted in concert with his co-perpetrator, or that he actively acquiesced in the use of deadly force.

Smith, Carlino, Mayo, and Compton were charged as codefendants. As a result of her part in the crime, Smith pled guilty to criminal conspiracy to commit second degree murder in exchange for her truthful testimony against all involved in the case. Carlino pled guilty to conspiracy and was awaiting sentencing at the time of Defendant's trial. Carlino testified that she was not told what to say and was asked only for the truth. Mahfouz, Smith, Milliman, and Carlino testified at Defendant's trial.

Mahfouz testified that she had lived with Smith for about six months at the time the murder occurred. Smith's children, Smith's father, and Smith's boyfriend, Compton, also lived there. According to Mahfouz, Mayo, her ex-boyfriend, and his brother, Milliman, would hang out at Smith's house. Carlino came to the house a few times, either with Mayo and Milliman or by herself. Mahfouz had seen Defendant, who was Compton's friend, at Smith's house about two or three times.

Mahfouz testified that on the day of the incident, Compton wanted to get some Xanax, but he could not. Mahfouz and Mayo arranged to buy Xanax from Anderson, a friend of the group. They made arrangements to buy thirteen bars for $90.00 and to pick up the Xanax at the Smithville store. According to Mahfouz, Compton put up the money for the purchase, and Carlino, Mahfouz, Smith, Compton, Mayo, and Milliman all went in Carlino's car to pick up the drugs. Once there, they met Anderson. Davidson, whom Mahfouz knew, was in the car with him. Both Mayo and Mahfouz got out of the car. Mayo handed Anderson the money, and Anderson

4

handed him the drugs in an opaque cigar package.[2] Anderson and Davidson left. Once Mayo and Mahfouz got back in their car, they dumped out the cigar package and found that they did not receive the amount of Xanax for which they had paid. According to Mahfouz, Compton was the angriest because he had put up the money. The group drove around trying to find Anderson and Davidson but were unsuccessful and returned to Smith's house. Mahfouz testified that when they got back to Smith's house, Mayo and Compton went inside and retrieved pistols. Mayo had Smith's pistol, and Compton had Milliman's pistol. Defendant joined the group[3] and had a gun as well, but his gun was a rifle, which Mahfouz had seen him with before. In her statement to police, Mahfouz said that she did not fully hear the conversation of the three armed men. But, at trial, she testified that she heard them talking about shooting up someone's house. Mahfouz said that when she heard this, she told Compton, Mayo, and Milliman that it was not a good idea and asked them to stay. Mahfouz testified that she and Milliman then went inside, took some of the Xanax, and played video games. The group left. Mahfouz testified that when the group returned, they said nothing about what occurred. The next morning, either Compton or Smith showed Mahfouz a posting indicating that Davidson had been killed.

Milliman confirmed that he, Mayo, Compton, Smith, Carlino, and Mahfouz arranged to buy some Xanax from Anderson on the night of the murder. When they met up with Anderson, he had a passenger in the car with him, but Milliman did not know the person. Milliman testified that after realizing they were shorted and having

---

[2] Lieutenant Cody Griffith of the Pineville Police Department testified that he obtained the store's video footage, which verified that Mahfouz and Mayo got out of the car and engaged in a transaction with two people in an SUV identified as belonging to the victims. This video footage was later inadvertently erased.

[3] Mahfouz testified that she thought that Defendant joined the group at Compton's request.

no luck finding Anderson, the group returned to Smith's house, where Compton made a phone call. Defendant walked over immediately thereafter. Milliman testified that Defendant was armed with a rifle, that Mayo had Compton's pistol, and that Compton had Milliman's pistol. According to Milliman, it was Compton's and Carlino's idea to go to the Orchard Loop residence, not Defendant's. Milliman and Mahfouz remained inside the house while the group left the house with Smith driving and Carlino in the front passenger seat. Mayo, Compton, and Defendant were also in the car. Milliman testified that about thirty minutes later, the group returned, anxious and talking about shooting up a house.

Smith testified that she knew Defendant as being a mutual friend of Mayo and Compton. She testified that Defendant occasionally hung out with the group of friends at her house, and when he did, he brought his gun with him.

Smith testified that everyone was angry after they were shorted Xanax pills. After an unsuccessful attempt to find the sellers, the group returned to her house. Defendant was called and later arrived with his gun. According to Smith, Mayo was armed with her gun, a Ruger nine millimeter, which she had reported stolen. She believed that Compton stole the gun from her and gave it to Mayo. Smith testified that she drove with Defendant seated behind her, Compton in the middle, and Mayo in the hatchback area. Mayo directed her to Davidson's house. Smith testified that the plan was for a confrontation and that a shooting was not discussed, at least not with her. Her intent was to stop in front of the Orchard Loop house and let the guys out of the car, but before they reached the front of the house, she heard multiple gunshots from the back of the car, and she panicked. Smith initially testified that she did not actually see Defendant shooting. When reminded of her testimony from a previous trial, she confirmed that she did:

6

Yes. The [sic], from behind me, the back window. I, at that point, as, as I realized shooting was happening I did see him behind me out the window, like peripheral vision at the moment of the shooting. Like as soon as the shooting started and my attention was, at that moment I did, yes.

Smith confirmed that she did not see either Mayo or Compton shoot. She stated that she heard enough shots to be certain that multiple guns were being fired. After the shooting, the group returned to her home where things were crazy, and a lot of different emotions were being exhibited. She testified that the group removed the different sized shell casings from Carlino's car while Defendant was "ranting and raving about if anybody, if anybody snitches, consequences." According to Smith, Defendant made it clear that if anyone told, "their fate would be the same."

Smith told police that Defendant said, "come on, y'all, I got y'all, I'll handle this." On redirect, Smith confirmed that Defendant said, "let's go send a message they can't just rob us." Finally, Smith confirmed that she told police that it was Defendant's idea and that Defendant said those things.

Carlino was seventeen when this crime was committed. She knew Defendant as being a friend of Smith and Compton, and she saw him at their house three times, including this incident. Carlino testified that she was "pretty sure" that each time she saw Defendant, he had a rifle with him.

Carlino testified that she put in $40.00 for the purchase of the Xanax and that Smith and Compton covered the rest of the $90.00 purchase price. After being shorted on their purchase, the group returned to Smith's house, where they divided the Xanax. Carlino testified that she left to change clothes and that when she returned to Smith's house, Defendant showed up with his gun. When everyone went outside to the parking lot, she was told that they were going to get either the pills or the money. She, Smith, Compton, Mayo, and Defendant got in the car to leave. She testified that she was not in a position to overhear anything from

Defendant. She confirmed that Compton and Mayo had pistols and that Defendant had his own gun. Carlino was in the front passenger seat because she was "messed up." Defendant sat behind her in the back seat, Compton was behind the driver's seat, and Mayo was in the hatchback area. When they reached their destination, Smith was instructed to drive in front of the house; and as soon as she did, Carlino heard gunshots. Carlino testified that she saw Mayo and Compton shooting out of the back driver's side window. She did not see Defendant fire a weapon, but, during the time that neither Mayo nor Compton were firing, she still heard gunshots. This is how she knew that Defendant was firing, noting that a rifle sounds much different than a smaller gun.

Sergeant Vincent Deville (Sergeant Deville) of the Pineville Police Department was one of the first officers to arrive on the scene. He observed Davidson lying on the ground in a pool of blood, which was mostly around his head and also saw bullet holes in the front of the house, through the front and garage doors, and inside the house. Two young children were found in the home and were taken to a neighbor's apartment.

Pineville Police Sergeant Jared Bennett (Sergeant Bennett), who was a crime scene investigator at the time of the incident, testified that he observed bullet holes in the residence and projectiles and casings in the roadway. Among the casings found were rifle casings, either a 5.56 millimeter or a .223 caliber, as well as pistol cartridge casings. Sergeant Bennett collected approximately $790.00 from Davidson's body.

Detective Will Smith (Detective Smith) of the Pineville Police Department testified that after Defendant was arrested, Defendant was questioned regarding his involvement in the shooting. Defendant admitted to knowing Compton and said that

he refused when Compton came by on the evening in question and asked him to go with him to do something.

On appeal, Defendant contends that he had no problem with anyone living in the Orchard Loop house and that he had not been involved in the drug purchase shortage. Additionally, Defendant notes that the witnesses at trial offered differing accounts as to why they were going to the house on Orchard Loop, some said to talk to the drug dealers, others said to confront them about the Xanax shortage, but none said to shoot at them. Defendant contends that the only evidence of a plan of "shooting the [Orchard Loop] house up" was elicited through the improperly admitted hearsay testimony of Mahfouz. Defendant notes that Carlino was in and out of consciousness on the night of the shooting and that Smith was heavily intoxicated and that because Smith was driving, she could not see anyone shooting. Defendant contends that the State's evidence failed to show that he had a revenge motive or specific intent to shoot someone. Additionally, Defendant contends that the State failed to show that he fired a rifle at the scene of the drive-by shooting.

We find that the evidence presented by the State at trial was sufficient to prove beyond a reasonable doubt that Defendant, armed with his rifle, actively participated in the drive-by shooting that resulted in Davidson's death. Witnesses placed Defendant in the vehicle, armed with his rifle, actively shooting with codefendants, at the house where Davidson was located. Although Defendant was not part of the initial drug purchase which prompted the retaliation, the State proved that Defendant possessed specific intent to kill by his statements that provoked and/or further provoked the group's act of retaliation for being shorted in their earlier drug purchase. This assignment of error has no merit.

*Grand Jury Indictment*

9

In his first assignment of error, Defendant contends that reversal of his conviction is required due to the State's failure to proceed by grand jury indictment for a crime punishable by death or life imprisonment.

On January 26, 2021, Defendant, along with other codefendants, was charged by grand jury indictment with the first degree murder of Davidson, in violation of La.R.S. 14:30, the attempted first degree murder of Anderson, in violation of La.R.S. 14:27 and 14:30, and conspiracy to commit first degree murder of Davidson, in violation of La.R.S. 14:26 and 14:30. On May 25, 2021, the State filed an amended grand jury indictment charging Defendant and his codefendants with the second degree murder of  Davidson, the attempted second degree murder of Anderson, conspiracy to commit second degree murder of Davidson and Anderson, conspiracy to commit attempted second degree murder of Davidson, and conspiracy to commit assault by drive-by shooting with a firearm. The amended indictment was signed by the grand jury foreperson and assistant district attorney. On February 23, 2023, the State filed an indictment in the clerk's office alleging that on May 25, 2021, the grand jury charged that Defendant was a principal to the offense of second degree murder in that he did kill with the specific intent to kill and inflict great bodily harm while engaged in the perpetration or attempted perpetration of an assault by drive-by shooting.

Defendant acknowledges that the State has the right to amend an indictment to charge *lesser* offenses but argues that, in this case, the State charged Defendant as a principal alleging this was a specific intent and great bodily injury crime and added the drive-by shooting alternative element to second degree murder. He notes that the grand jury did not include the assault by drive-by shooting as an element of second degree murder and limited it only to the conspiracy count. The final charging instrument added that Defendant had the specific intent to kill *and* inflict great bodily

10

harm *and* while engaged in the perpetration or attempted perpetration of an assault by drive-by shooting. Accordingly, Defendant contends that the State acted beyond its authority in indicting him for second degree murder by drive-by shooting. The State contends that it has complete authority to amend indictments both as to form and substance any time before trial.

In *State v. Neslo*, 433 So.2d 73, 81–82 (La.1983), the supreme court addressed a similar claim as follows:

> By this assignment of error, defendant complains that the trial court erred in allowing the assistant district attorney to amend the first degree murder indictment immediately prior to trial. Defendant contends the amendment could only be made by the grand jury and that the amended indictment violated C.Cr.P. 464 which requires a plain, concise and definite written statement of the essential facts constituting the offense charged.

> On the morning of trial the assistant district attorney amended the indictment to read (underlining indicates new language):

> ". . . committed first degree murder of one SUE THERIOT, while in the perpetration of an <u>attempted</u> aggravated kidnapping, <u>while in the perpetration of an attempted aggravated rape, while having the specific intent to kill or inflict great bodily harm on more than one person</u>, . . ."

> . . . .

> This court has held that the prosecutor may make substantive amendments to a grand jury indictment before trial begins. *State v. Lovett*, 359 So.2d 163 (La.1978); *State v. Sheppard*, 350 So.2d 615 (La.1977); *State v. Bluain*, 315 So.2d 749 (La.1975). Where the defense can show prejudice as a result of the amendment, the court should grant a motion for a continuance. C.Cr.P. 489. In this case, the amendment to the indictment conformed the indictment to the state's answer to defendant's motion for a bill of particulars. There was no surprise to the defendant that the state was relying on R.S. 14:30(1) and (3) as the aggravating circumstances. The trial court properly allowed the amendment to the indictment, and did not err in denying defendant's motion for a continuance.

> C.Cr.P. 465(A)(31) provides that the proper short form indictment for first degree murder is "A.B. committed first degree murder of C.D." Section B provides that the short form indictment "may also include a statement of additional facts pertaining to the

offense charged. If this is done it shall not affect the sufficiency of the specific indictment form authorized by this article." C.Cr.P. 486 provides that unnecessary allegations in an indictment may be disregarded as surplusage. As this indictment, both before and after the amendment, contained the allegations required by the Code of Criminal Procedure, the indictment is not defective and may serve as the basis for a valid prosecution.

In the present case, the State's allegations of specific intent and great bodily injury committed during the perpetration of a drive-by shooting provided more details to the charges contained in the indictment. There is no indication in the record that Defendant moved for a continuance due to surprise. Accordingly, we find that the trial court did not err in allowing the amendment to the indictment.

*Jury Issues*

In his second assignment of error, Defendant contends that Juror Michael Rachal's misconduct by researching the case during the voir dire stage of trial requires a new trial, adding that Mr. Rachal's assertion of his ability to be impartial was insufficient. Additionally, Defendant complains that the uncertainty as to the verdict expressed by juror Tina Johnson when the verdict was returned requires a new trial.

Mr. Rachal was on the second panel of prospective jurors. They were instructed not to listen, read, watch, or review any news about the case from any source as the case must be decided based only on evidence presented in the courtroom. The following morning, Mr. Rachal was asked if he knew anything about the case other than what he was told in the courtroom. He responded, "[l]ast night I looked online and found a Town Talk article." When asked if there was any reason he could not serve as a juror, Mr. Rachal responded, "[n]o, sir." Later, Mr. Rachal was questioned out of the hearing of the other prospective jurors. He said that he read an article on the Town Talk's website but confirmed that, based on what

12

he read, he had not formed an opinion as to Defendant's guilt. The following exchange then occurred:

> THE COURT: And based upon what you've read from the Town Talk website, can you put any of those, that information and only make a decision based upon the evidence in the case that you hear in the courtroom?
>
> MR. RACHAL: Yes. I would have to base my decision on the evidence in the courtroom. That article, you know, was just stating that there was a trial that was gonna occur.

Defense counsel challenged Mr. Rachal for cause, but the trial court denied the challenge, stating:

> He had stated that he was in the courtroom. That, I, as the Court, gave the instructions on not to look, watch, read, like that. He said he was not aware of it. That he did not hear the Judge say that. However, we asked him what he did read, that there was a trial ongoing. That jury selection was taking place. The scene of the event and the victim. Those are general descriptors as far as the case is concerned that has been out there. I don't believe that that is any kind of evidence for or against either side. It's just general evidence that people can have even before jury selection. He did say that he has not based – has not formed any opinion. And that he could base . . . his decision on the evidence in the courtroom. The Court will take Mr. Rachal at his word. And then we'll give instructions to the jury again of not to do that as far as looking up, seeing, staying away from that. So at this time, the challenge for cause will be denied.

This challenge was re-urged by the defense but denied by the court, and Mr. Rachal was seated as the twelfth juror. Defense counsel chose not to use his one remaining peremptory challenge, bringing his total used during voir dire to eleven.

In *State v. Koon*, 96-1208, p. 17 (La. 5/20/97), 704 So.2d 756, 767 *cert. denied*, 522 U.S. 1001, 118 S.Ct. 570 (1997), the supreme court stated:

> However, we need not reach the issue of whether failure to dismiss Ms. Meyers for cause was error because the defense did not use all its peremptory challenges. As we stated in *State v. Mitchell*, in order to prove error warranting reversal of a conviction and sentence, the defendant must show (1) the erroneous denial of a challenge for cause and (2) the use of all peremptory challenges. 94–KA–2078 (La. 5/21/96), 674 So.2d 250, 254, *cert. denied*, [519] U.S. [1043], 117 S.Ct. 614, 136 L.Ed.2d 538 (1996) (citing *State v. Cross*, 93–1189 (La. 6/30/95), 658 So.2d 683). Because the defense failed to use all its peremptory challenges, this assignment of error lacks merit.

Accordingly, we find that this claim lacks merit because Defendant did not exercise all of his peremptory challenges.

Defendant additionally claims the trial court erred in failing to either order continued jury deliberation or declare a hung jury when during polling, Juror Tina Johnson expressed uncertainty as to her verdict.

Louisiana Code of Criminal Procedure Article 812 provides:

A. The court shall order the clerk to poll the jury if requested by the state or the defendant. The poll shall be conducted in writing by applying the procedures of this Article, and shall be done in open court.

B. (1) The procedure for the written polling of the jury shall require that the clerk hand to each juror a separate piece of paper containing the name of the juror and the words "Is this your verdict?" Each juror shall write on the slip of paper the words "Yes" or "No" along with his signature. The clerk shall collect the slips of paper, make them available for inspection by the court and counsel, and record the results.

(2) If a sufficient number of jurors as required by law to reach a verdict answer "yes" the clerk shall so inform the court. Upon verification of the results, the court shall order the clerk to record the verdict and order the jury discharged. If an insufficient number required to find a verdict answer "Yes," the court may remand the jury for further deliberation, or the court may declare a mistrial in accordance with Article 775. The polling slips may be placed under seal upon order of the court, which shall state the specific reasons for placing the polling slips under seal. If so ordered the polling slips shall not be released to the public without a subsequent order of the court authorizing their release. If the court orders the release of the polling slips, the names of the jurors shall be redacted.

In the present case, after the jury returned with its verdict of guilty of second degree murder, the court found the verdict to be in proper form. Defense counsel requested polling. Polling slips were provided to the jurors, and they were asked to make sure the polling slip that they received had their name on it, circle either yes or no, and place their signature on the slip. The following exchange occurred:

JUROR TINA JOHNSON: I'm just not sure.

14

THE COURT: What you don't know? Just please answer the question . . . on your polling slip. Make sure you have your one with your name on it[,] and then you just answer the question[,] and the question on the piece of paper is, is this your verdict? And you just circle either yes or no. After you have finished, look up, and the bailiff will take your piece of paper from you.

MR. ARMSTRONG: This is crazy.

THE COURT: Ms. Johnson, I need to return your piece of paper to you so you can answer the question, please. Thank you. Mr. Lacour, Mr. Hall?

Counsel reviewed the polling slips, and then the court handed the polling slips to the clerk to be placed under seal and noted that "it is proper as to form." The court ordered that the jury verdict be recorded. Each attorney responded that they had nothing else to add, and the jury was dismissed.

Defendant contends that when Ms. Johnson expressed uncertainty, the court had the option to either order that the jury continue deliberating or accept a hung jury. It did not have the option of insisting that Ms. Johnson reach a verdict with everyone watching. Defendant contends that this method coerced Ms. Johnson to make a decision on the spot and change her vote.

This court has found that the failure to contemporaneously object to the procedure used to poll the jury prohibited review of the issue on appeal. *State v. Lamb*, 458 So.2d 996 (La.App. 3 Cir. 1984). The defense urges this court to view Defendant's statement that "this is crazy" as a pro se objection.

Addressing a similar issue in *State v. James*, 99-1858, pp. 5–9 (La.App. 3 Cir. 5/3/00), 761 So.2d 125, 129–31, *writ denied*, 787 So.2d 1010 (La. 3/23/01), this court stated:

> . . . Defendant argues that the trial court erred in interrogating a juror regarding her "no" vote during the written polling of the jury, in violation of La.Code Crim.P. art. 812. The State responds that defense counsel failed to make a contemporaneous objection to the trial court's polling procedure and, alternatively, that any error was harmless.

15

At the close of deliberations, the six-person jury presented its verdict forms for each charge. The trial court then ordered that the jury be polled in writing. On the charge of unauthorized entry of an inhabited dwelling, the written poll revealed a unanimous vote for conviction. On the charge of second degree battery, however, Juror Braden[] indicated on her polling card that she did not vote to convict. Under La.Code Crim.P. art 782(A), the concurrence of all six jurors is required to render a verdict in this case.

. . . .

Q. I have asked all of the jurors to complete this card and write out was that their verdict. Did they concur with that verdict at the time the vote was reached as a yes or a no. And your card said no.

A. Yes, sir.

Q. Is that correct?

A. Yes, sir.

Q. *Alright. At the time that ya'll a [sic] took a vote on the guilty of Second Degree Battery you voted no?*

    . . . .

A. *We talked about it and I felt like there was no proof saying that he actually did do it. But I felt out voted, so that's why we agreed on the yes.*

Q. *Okay. And at the conclusion of your deliberation and votes did you eventually vote yes, then?*

A. *Yes, sir.*

    . . . .

Q. *So, in preliminary discussions and please, it's unusual and I don't want to misstate anything for the record. Do I understand that in preliminary discussion that you disagreed for the record and now, at this point when ya'll [sic] finally voted you had stated yes, is that right?*

A. *Yes, sir.*

Q. Okay.

THE COURT: I'll let that be noted for the record. And thank you very much. You can have a seat. I'm going to order that the jury polling cards be sealed and made a part

16

of the record. Be put in an envelope along with the ... not sealed, but made part of the record with the responsive verdict forms.

(Emphasis added.)

. . . .

The trial court did not comply with [] article [812] because it questioned one juror in open court rather than remanding the entire panel for further deliberation or declaring a mistrial. The appellate record contains an incomplete transcript of the trial court proceedings, but a minute entry indicates that a bench conference was held immediately before Juror Braden was interrogated and that defense counsel later objected to the verdict as illegal. In *State v. Bannister*, 97-48, p. 11 (La.App. 4 Cir. 1/27/99); 726 So.2d 1135, 1142, the appellate court presumed that defense counsel had entered a contemporaneous objection to the trial court's improper polling procedures, "given the several bench conferences and obviously thorough argument on point." Similarly, we find that present defense counsel adequately preserved this issue for appellate review.

In *Bannister*, 726 So.2d at 1141, the trial court determined that the results of a written poll did not reflect a legal verdict, at which time a juror blurted out, "I have the tally right here . . . you all have to vote the same way–you all voted upstairs." The trial court stopped that juror, repeated its instructions, and polled the entire panel again. After two bench conferences, the trial court polled the jury a third time before it pronounced a legal verdict. The appellate court noted the error of not returning the panel for deliberation, but found it harmless, as the record did not indicate that the comments of the juror influenced any of the others to change their votes. In *State v. Amato*, 96-606 (La.App. 1 Cir. 6/30/97); 698 So.2d 972, *writ denied*, 97-2626 (La. 2/20/98); 709 So.2d 772, one juror wrote "no" on a written ballot, but after questioning from the trial court stated that he probably misunderstood the written form and that he meant to respond "yes." Additionally, the jury foreman stated that the vote was unanimous at the time the verdict was reached. The appellate court found no error where "the record show[ed] beyond a reasonable doubt that the verdict on Count 1 was unanimous." *Id.* at 688-89.

In the present case, Juror Braden readily admitted that she voted to convict during deliberations. Although she may have initially expressed some doubt, she changed her mind and voted with the majority. The record does not reveal that she was pressured into changing her vote, other than she was "out voted." Although proper procedure would have been to remand for further deliberation, we do not find that noncompliance with Article 812 was reversible error in this case. By questioning Juror Braden, the trial court did determine that all six jurors voted to convict Defendant of second degree battery. This assignment of error lacks merit.

17

In the present case, as in *James*, the trial court's actions were not coercive but were simply an effort to clarify the return of a proper verdict by asking Ms. Johnson to indicate what her vote was. The record does not support a finding that Ms. Johnson was coerced to change her vote. We find that this assignment of error has no merit.

## *Other Crimes Evidence*

In his fourth assignment of error, Defendant challenges the court's admission of other crimes evidence consisting of hearsay statements about drugs and a conspiracy. He additionally claims that the trial court improperly allowed the admission of irrelevant photographs of Defendant's association with weapons. He claims that these two errors deprived him of a fair trial and that a new trial is required.

First, Defendant contends that statements made by Mayo and Compton were improperly admitted through the testimony of others under the conspiracy exception to the hearsay rule, noting that Defendant was not charged with conspiracy. He claims that many of the statements occurred before he arrived on the scene or was aware of the "bad drug deal" that occurred. Defendant concedes that although the statements at issue could, in fact, be considered in making the preliminary determination of whether there was a prima facie case of conspiracy, the State was required to provide other evidence that was independently admissible to support the prima facie case of conspiracy. Defendant claims that the State presented no testimony establishing his involvement with the earlier drug deal or his participation in the planning of the subsequent drive-by shooting. Further, he contends that the events were not immediately occurring. Essentially, he claims that the contested hearsay evidence did not fall under the conspiracy exception to the hearsay rule (non-hearsay) because the State did not establish a prima facie case of conspiracy.

The State asserts that that it established a prima facie case of conspiracy through Smith's testimony that she went with others to purchase Xanax from Anderson but that they did not receive all the bars they purchased. She confirmed that Defendant said, "come on, they robbed y'all. Let's go get the money back. Let's go send a message. Let's go show them that they can't just rob anybody." Also, she confirmed that he said, "come on y'all, I got y'all, I'll handle this." No objection was lodged during this testimony. Further, the State contends that it did not have to charge Defendant with conspiracy for the conspiracy exception to apply. *See State v. Woodard*, 03-636 (La.App. 4 Cir. 4/30/03), 847 So.2d 629.

Louisiana Code of Evidence Article 801 provides, in pertinent part:

> **D. Statements which are not hearsay.** A statement is not hearsay if:
>
> . . . .
>
> **(3) Relational and privity admissions.** The statement is offered against a party, and the statement is:
>
> . . . .
>
> (b) A statement by a declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of the conspiracy, provided that a prima facie case of conspiracy is established[.]

It is unnecessary that a defendant be charged with conspiracy for this evidentiary rule to be utilized. *State v. Gutter*, 393 So.2d 700 (La.1981). The challenge here, the adequacy of the State's prima facie showing, was discussed by this court in *State v. Howard*, 04-499 (La.App. 3 Cir. 11/17/04), 888 So.2d 375, (footnote omitted) *writ denied*, 04-3216 (La. 4/8/05), 899 So.2d 13.

> In *State v. Matthews*, the second circuit held:
>
> > A prima facie case of conspiracy is presented when the state introduces evidence which, if unrebutted, would be sufficient to establish the facts of the conspiracy. *State v. Nall*, 439 So.2d 420 (La.1983). The statements of the

declarant may be considered by the trial court in making the preliminary determination of whether there is prima facie evidence of a conspiracy. However, the statements by themselves will not establish a prima facie case of conspiracy. *State v. Myers*, 545 So.2d 981 (La.1989). The state must provide other evidence that is independently admissible to support the prima facie case of conspiracy.

The standard for determining the admissibility of statements made by co-conspirators is less than that required to convict a defendant of conspiracy to commit an offense. Such statements, if admissible, only constitute evidence which the jury may consider in reaching its conclusion as to whether a defendant did or did not unlawfully participate in a conspiracy to commit an offense beyond a reasonable doubt. Accordingly, a trial court's determination as to the admissibility of such evidence, i.e., whether the state has made a prima facie showing of a conspiracy as to make the co-conspirators' statements admissible or inadmissible under LSA–C.E. Art. 801(D)(3)(b), will not be overturned absent clear error. *State v. Lobato*, 603 So.2d 739 (La.1992), remanded on other grounds.

*Howard*, 888 So.2d at 380–81

In this case, there are several sections of testimony challenged by Defendant.

The first is as follows:

1. Syria "Kelsey" Mahfouz's testimony that after the five in the car were shorted in their drug purchase, they talked and got guns. While she could not hear the males talking, she "knew" what they were talking about. . . . She "thinks" Noon went to get the defendant then. The first objection was sustained but the second was overruled. . . . When they returned, she heard them talking about "shooting the house up." The defendant's objection was overruled when the State claimed a "conspiracy" exception. . . .

Mahfouz testified that after the group was shorted in their drug purchase, Milliman, Mayo, and Compton talked, and then they retrieved guns. Mahfouz said that she did not hear what was discussed but that she made an assumption based on the group subsequently retrieving guns from the house. There was no objection raised during this testimony. It was when Mahfouz subsequently said that she had an idea about what was being discussed that an objection was raised based on

speculation. The objection was sustained. The testimony progressed, and when Mahfouz was asked if she knew why Defendant arrived and joined the group, she said that she believed that Compton went and got him. Another objection based on speculation was sustained. The question was rephrased to ask whether she knew if Compton went to get Defendant, and Mahfouz responded that she was "pretty sure" that he did. This objection based on speculation was overruled. She then testified that Compton left and that when he returned, Defendant appeared. Finally, Mahfouz testified that after the shooting, she overheard something about shooting a house up. The objection to this testimony was overruled as being a conspiracy exception to the hearsay rule, which is the crux of the issue in this assigned error. Contrary to Defendant's argument, the State *did* establish a prima facie case of conspiracy. Although Defendant was not involved in the initial purchase of drugs, during which the purchasing group was "shorted," testimony presented through Milliman and Smith established that Defendant arrived at Smith's house, armed with a rifle, after having been contacted. Defendant got into the car with the group who was going to the Orchard Loop house for a confrontation with the seller(s). Milliman testified that this was Compton's and Carlino's idea, not Defendant's.

According to Smith, Defendant threatened consequences to anyone who snitched, and he also told the group, "come on," "I got y'all," "I'll handle this," "[l]et's go get the money back," "[l]et's send a message," and "[l]et's go show them, that they can't just rob anybody." Carlino testified that she was told that they were going to either get the pills or the money, and she got in the car with Smith, Compton, Mayo, and Defendant and went to the Orchard Loop house. The State clearly established a prima facie case of conspiracy.

Additionally, with respect to Defendant's argument that the conspiracy was no longer ongoing, we note that:

> The conspiracy is presumed to continue unless or until the defendant shows his withdrawal from or the termination of the conspiracy. *United States v. Walker*, 796 F.2d 43, 49 (4th Cir. 1986). To prove withdrawal, a defendant must show affirmative actions made by him that are inconsistent with the object of the conspiracy. *United States v. United States Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). Such affirmative actions include making a clean break through confession to the authorities as well as notification to the co-conspirators of abandonment or withdrawal. *United States v. Patel*, 879 F.2d 292, 294 (7th Cir. 1989), *cert. denied*, 494 U.S. 1016, 110 S.Ct. 1318, 108 L.Ed.2d 494 (1990).

*State v. Dyess*, 18-241, p. 8 (La.App. 3 Cir. 11/7/18), 258 So.3d 1095, 1100, quoting *State v. Woodard*, 03-636, pp. 3–4 (La.App. 4 Cir. 4/30/03), 847 So.2d 629, 632.

Defendant has not shown he withdrew from the conspiracy or that the conspiracy was terminated. Accordingly, we will not overturn the trial court's determination concerning the admissibility of this evidence.

2. Blaine Milliman['s] testimony that when the others returned, "they" said they "just got done shooting up the house." . . . According to Milliman, they all went inside, including the defendant, where the "talked about what they did." . . .

3. Based on the ADA's instruction, Kaitlyn Carlino said "They told me we were going to get the Xanaxes or the money. I didn't know which one. I wasn't sure. They just told me that they talked about it with them and it was okay, that the deal was fine. They were just going to make up for it because they were friends with Kelsey." . . .

These statements were not objected to at trial when made by Carlino and Milliman. Accordingly, the question of their admissibility was not preserved for appellate review. La.Code Crim.P. art. 841; *State v. Vice*, 22-512 (La.App. 3 Cir. 4/19/23), 365 So.3d 155, *writ denied*, 23-669 (La. 11/21/23), 373 So.3d 457; *State v. Day*, 14-708 (La.App. 3 Cir. 12/23/14), 158 So.3d 120.

4. The defendant's objection to Kaitlyn Carlino's recounting of Mayo's statement that "there were only five Xanaxes in there" was overruled under the "conspiracy" exception. . . . The statement was the whole basis for the State's theory that this was a revenge incident.

During Carlino's testimony, she said that Mayo opened the package and told them that there were only five Xanax. Mahfouz provided similar testimony regarding the shortage, additionally noting that Compton was the angriest of the group as he had put up the most money to purchase the drugs. If "hearsay evidence is improperly admitted at trial, the appellate court must decide whether the evidence contributed to the verdict. If the inadmissible hearsay evidence is merely cumulative or corroborative of other testimony introduced at trial, its admission is considered harmless." *State v. Williams*, 35,911, p. 12 (La.App. 2 Cir. 9/18/02), 828 So.2d 180, 188. Here, the evidence is corroborative of other testimony introduced at trial. The State established a prima facie case of conspiracy, and any error in its admission was harmless.

*Social Media Posts*

Defendant contends that the admission of three photographs depicting five firearms associated with Defendant was improper and that a new trial is required. Specifically, Defendant argues that the pictures were improperly admitted as La.Code Crim.P. art. 404(B)(1) evidence and that the probative value did not outweigh the prejudicial effect. He claims that it was the State's mission to portray Defendant as the "older guy" of whom everyone was afraid and who was called in as the "enforcer."

The State contends that the social media posts of Defendant holding firearms did not constitute other crimes evidence, and even if they did, the testimony regarding the guns was adduced and admitted prior to the admission of the photographs, the evidence at issue in this assignment of error. Simply put, the State contends that the photographs corroborated the prior testimony to which there was no objection.

23

Detective Smith of the Pineville Police Department testified that after Defendant was arrested, he was questioned regarding his involvement in the shooting. Statements provided by codefendants indicated that Defendant possessed a long gun or rifle. Then, Detective Smith looked at Defendant's social media account and saw pictures of firearms. Defendant told Detective Smith that the guns, which he had purchased online, were fake. When Detective Smith testified that they appeared to him to be real, an objection was lodged by defense counsel based on speculation. The trial court overruled the objection, stating: "[h]is perception as far as looking, overruled." Detective Smith confirmed that there was at least one photograph in which Defendant was pictured with a weapon similar to an AR-15.

On cross-examination, Detective Smith confirmed that there was no scientific evidence recovered that tied Defendant to this case. He also acknowledged that the photos of the firearms that he saw could depict either fake or real guns. On redirect examination, the photos of the firearms were admitted in evidence as State Exhibit 52 in globo. Defense counsel objected on the basis that he had just received the photographs as he sat down from the podium and thus had not prepared. The trial court stated that it would "take [his] argument a little later," but it overruled the objection and allowed the admission of the photographs at that point. Defense counsel was then given the opportunity to conduct re-cross examination to address the photographs. During this examination, defense counsel asked whether Defendant's face appeared in any of the photographs, and Detective Smith responded that it did not; however, he confirmed that in one of the photographs, the person was wearing a mask. Detective Smith also confirmed that none of the weapons pictured were recovered from Defendant's home, and none were tied to this case. Defense counsel asked whether the pictured guns had any bearing on this case or how the arrest was made. He responded, "I mean, just in the sense that it, it shows

24

that there, there seems to be some kind of association to Mr. Armstrong and firearms. That was all I could conclude." After Detective Smith was released as a witness, the court allowed defense counsel to argue his objection:

> MR. LACOUR: . . . the State's discovery made mention of those photos. Okay, last week I met with Mr. Hall in his office and his secretary to make sure I had everything. And then we worked on a stipulation. But to provide me with those, maybe if he would have gave even to me yesterday, but to provide them to me the moment I walk down from the podium to then say I'm going to use them, which he brought the photos up first. I was just asking whether or not they could be real or fake. He said they could be either way, because he had previously testified that they appeared to be real. Of course that was an assumption, but to, and, and I won't go as far to say that Mr. Hall blind sided me. He didn't. I knew that they existed, but why they hadn't been provided for me? . . . [T]his case is three years old. That should have been in discovery[,] and it wasn't. Okay? And then I just had to cross on the fly not really prepared that those photos were going to be introduced into evidence. . . . [D]iscovery should be given in a timely manner. Have I been surprised with discovery before or doing [sic], sure. Sure, it happens, but it's usually something nobody knows about or something that has just come to light. We've been knowing about these photos or the State did for three years. And this morning is when they decide to say we're going to introduce it into evidence. . . . I'm objecting that, you know, there's a procedure we should follow. I should have [] had those photos or at least yesterday. Give . . . them to me yesterday when I'm leaving court. Maybe I can go home and work on them some. I had no time to prepare that. Thank you.

>      . . . .

> MR. HALL: Yes, sir. I agree with Mr. Lacour in that they were referred to in the reports. It was not a secret. It was known. I would ask that the Court take note of the fact that I did not put them out in my direct examination. Mr. Armstrong's statements had many problems with it in that there was a lot of other crimes evidence. That's why I didn't use the recording and was trying to gently put forth as much that I felt like incriminated him as I could without stepping on other areas. That's why I chose not to use them. However, when the decision was made to cross to go into fake guns I felt like it was necessary for the jury to know at that time. And that is when that decision was made[,] and that's why they were sent to Mr. Lacour's phone at that time. Had he left the issue alone, I would not have done that, but he did not. He asked about photos of Mr. Armstrong holding firearms and could they had [sic] been fake. They're very obviously real in the photographs, and that's what the issue was. There was no intent to ambush or anything like that. I was trying to take a ticklish issue of a statement with many issues in it and deal with it fairly. And I think that in light

25

of the fact that the photographs have been known by both sides for three years is certainly fair. And so that is the basis why I did what I did.

. . . .

MR. LACOUR: Real or fake came up in direct. . . . Detective Smith clearly said Mr. Compton responded by saying the guns [were] fake. He thought that they could be real. I didn't bring up fake first. That's his statement. And I appreciate it. I know what Mr. Hall was trying to do, because I know that statement is full of 404(b) malice, but I didn't open the door to all of that. The State brought this stuff up. They . . . brought it up by referencing his statement to police. So I follow up with what they had already brought out. They opened the door to it, okay, not me. But all I'm getting him to reiterate is a picture of guns could either be real or fake. And he couldn't say that they were real definitely either. What I'm just saying is how did these photos come in? . . . [D]iscovery's pretty clear, Judge. I [ ] should have [] had them. Even if they didn't intend to use them, I should have them. I should have everything that they have from the police. I should have it already, not walking down from a podium. That's not how you do that. Thank you.

THE COURT: . . . [T]he photo issue was brought up when Mr. Hall was questioning the detective, photo of the picture with the AR. And Mr. Lacour had the opportunity to cross that, which he did, as far as whether they were fake or not. Also . . ., both sides agree that the discovery mentioned the photos which is way before today[.] . . . So they're inside of the discovery of which both the State and the defense have had an opportunity for. Bringing it up today, short notice what it is, the photos were already [] known by the defense. Which the only surprise would have been probably the publication of them. Court has already, when the jury was present, overruled the objection to the non-admissibility of the photos. The Court will stand by that and allow those photos to have been admitted and also published to the jury.

Louisiana Code of Evidence Article 404(B) prohibits the use of other crimes,

wrongs, or acts, providing in pertinent part:

[E]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

26

The objection raised at trial was based on the late disclosure of the evidence, not that it was the type of evidence prohibited by art. 404(B).

In *State v. McCoy*, 16-948, pp. 15–16 (La.App. 3 Cir. 5/10/17), 219 So.3d 538, 548–49, *writ denied*, 17-1151 (La. 5/25/18), 242 So.3d 1232, this court addressed a similar issue:

> From our review of the record in this case, it appears that the defendant and the State were both provided with the Louisiana State Police Crime Laboratory's firearm's analysis for the St. Landry Parish evidence completed on February 6, 2014, which linked the gun used to shoot White with the gun the defendant fired on January 22, 2014, in Lafayette Parish. The State argues that it was not aware of the connection and filed its 404(B) motion as soon as it learned of it. However, the State learned of the connection on April 7, 2016, six days after the trial court's April 1, 2016 hearing deadline for 404(B) motions. On April 1, 2016, the trial court set a *Prieur* hearing for April 8, 2016. It was at this *Prieur* hearing that the trial court ruled that the State did not provide reasonable notice for the other crimes evidence related to the gun. On April 27, 2016, after the hearing was continued from April 13, 2016, the trial court reversed its previous ruling and found that any problems with reasonable notice had now been cured because the "defendant has now been given time to prepare" and ruled that the other crimes evidence was admissible.
>
> The supreme court has held that a "district court's ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion." *State v. Taylor*, 16–1124, 16–1183, p. 18 (La. 12/1/16), 217 So.3d 283, 2016 WL 7030750. Furthermore, the supreme court in *State v. Blank*, 04-204, p. 40 (La. 4/11/07), 955 So.2d 90, 123–24, *cert. denied*, 552 U.S. 994, 128 S.Ct. 494, 169 L.Ed.2d 346 (2007) (footnote omitted), stated the following regarding the effect of late notice on other crimes evidence:
>
>> [E]ven assuming that the state's notice of its intent to introduce the other crimes evidence was not filed in a timely manner, not every violation of pre-trial procedures, including *Prieur* violations, requires reversal. Before a defendant can complain of such a violation, he must show prejudice. *State v. Sanders*, 93-0001, p. 14 (La. 11/30/94), 648 So.2d 1272, 1284 (*citing State v. Hooks*, 421 So.2d 880 (La.1982)); *State v. Strickland*, 398 So.2d 1062 (La.1981). *Prieur* speaks of the "substantial risk of grave prejudice" to a defendant arising out of inadmissible or surprise admission of other crimes evidence, but does not presume that prejudice. [*State v.*] *Prieur*, [277 So.2d 126], 128 [ (La.1973) ].

Considering all of this, we find that the trial court's decision to admit the other crimes evidence was not an abuse of discretion. The defendant failed to allege with any specificity how he was prejudiced by this late notice or what about his trial strategy was changed because of the admission of the other crimes evidence.

Finally, out of an abundance of caution, we note *State v. Garcia*, 09-1578, p. 55 (La. 11/16/12), 108 So.3d 1, 39, *cert. denied*, —— U.S. ——, 133 S.Ct. 2863, 186 L.Ed.2d 926 (2013) . . . :

> Finally, the erroneous admission of other crimes evidence has long been held subject to harmless error review. La.Code Crim. Proc. art. 921; *State v. Johnson*, 94-1379, pp. 14-15 (La. 11/27/95), 664 So.2d 94, 100–01 (errors leading to improper admission of evidence subject to harmless-error analysis; error harmless if verdict "surely unattributable" to error)(quoting *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993)).

We find that even if the trial court erroneously admitted the other crimes evidence, considering the other evidence admitted at trial[,] the error was harmless. For these reasons, this assignment of error lacks merit.

The trial court did not abuse its discretion in admitting the photographs at issue. Even though he contended that the photographs were not timely provided, Defense counsel admitted that he knew of their existence. The photographs corroborated the earlier testimony of Detective Smith regarding what was depicted in them, to which the only objection was speculation regarding the authenticity of the guns. Defendant has failed to allege specifically how his trial strategy was changed because of the admission of this evidence. Finally, any error in the admission of these photographs was harmless error considering the overwhelming evidence of Defendant's guilt presented at trial. This assignment of error has no merit.

*Excessive Sentence Claim*

Defendant contends that, although defense counsel made no motion for a downward departure from the statutorily required life sentence in this case, an

28

appellate court must consider whether the sentence is constitutionally excessive. He contends that the sentence is excessive considering that the court did not state that Defendant had any criminal history, and there was no consideration of mitigating factors, such as his minor role in the incident and his lack of involvement in the initial drug deal. He further contends that the trial court improperly focused on sending a message and societal concerns, rather than tailoring a sentence for him. Finally, Defendant contends that his defense attorney's performance at sentencing was deficient in that he did not object to the trial court's intention to use him as an example to send a message. He additionally notes that counsel did not ask for a presentencing investigation report, did not present mitigating circumstances, made no motion for downward departure, and did not file a motion to reconsider sentence. Thus, he contends that his sentence should be vacated and the case remanded for resentencing.

At sentencing, the court detailed the facts of the case and then explained that:

The court should review the defendant's personal history, that being his age, family ties, health, along with any criminal record and seriousness of the offense, the likelihood that he would commit other crimes, and the potential for rehabilitation through correctional services. Also, in any sentencing, the court looks to the goals of sentencing. Rehabilitation. The protection of the public and society. The victim. And the punishment and deterrence. The first consideration is rehabilitation. Can this defendant be rehabilitated? Does he have sufficient education, training, and life experience to rehabilitate himself? He has no high school diploma. He has a work history. However he needs life skills and training. By law the sentence for second degree murder is life imprisonment. Given the defendant's age, he needs a structural, custodial environment to help him develop those life skills. The second consideration is society. What sentence today would serve as a general deterrence for the community as a whole. The defendant has been convicted of second degree murder, a crime of violence. Deterrence to society is a strong consideration. The societal issue herein is the escalating epidemic of young males with guns, many that lead to senseless deaths. The sentence today should have an effect on that problem. We have to send out a message of some kind of the [sic] signal that when someone commits a crime such as this, this is what's going to happen. Alexandria has had several murders this year, three just in this last week, on March seventeenth, all in one day and

then another shooting, a drive by, in the middle of the day on March ninth where an eleven year-old was hit by a bullet. The general public is concerned with the use of firearms in criminal activity. Third consideration is the victim. How the crime has affected the victim. Edwin Davidson was only seventeen years of age at the time he was shot and killed, way before the prime of his life. With a newborn child he never saw, nor held, nor raised, so justice demands that the defendant be sentenced accordingly. The fourth consideration is punishment. What sentence should be given to specifically deter the defendant from future criminal conduct? How long of a sentence should the defendant serve as just penalty for the crimes he's committed? The legislature has decided that sentence. A life sentence. Where there is a mandatory sentence, one that is legally required to be imposed, the court need not justify the sentence under the Louisiana Code of Criminal Procedure Article 895.1 [sic] wherein the court looks at the aggravating and mitigating circumstances.

Defendant was asked if he had any statement to make or evidence to present, and he responded that he did not. The court then imposed life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence.

In *State v. Little*, 50,776, pp. 4–5 (La.App. 2 Cir. 8/10/16), 200 So.3d 400, 403 (citations omitted), *writ denied*, 16-1664 (La. 6/16/17), 219 So.3d 341, the court stated:

It is within the legislature's prerogative to determine the length of the sentence imposed for the crimes classified as felonies, and the courts are charged with applying these punishments unless they are found to be unconstitutional. The decision to assess mandatory life sentences is within the prerogative of the legislature.

When there is a constitutional mandatory sentence, a trial court need not justify, under La. C. Cr. P. art. 894.1, a sentence it is legally required to impose.

In rare circumstances, a downward departure from a mandatory sentence may be warranted if the defendant shows, by clear and convincing evidence, that he is exceptional, namely, that he is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. Although courts have the power to declare a mandatory minimum sentence excessive under Article 1, § 20 of the Louisiana Constitution, this power should be exercised only in rare cases and only when the court is firmly convinced that the minimum sentence is excessive.

In *State v. Griffin*, 21-452, pp. 10–11 (La.App. 3 Cir. 3/2/22), 351 So.3d 385, 390–91, (footnote omitted) *writ denied*, 22-600 (La. 6/1/22), 338 So.3d 496, this court addressed a claim of ineffective assistance based on counsel's failure to seek a downward departure from a mandatory life sentence:

> Claims of ineffective assistance are analyzed using the two-pronged test in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, Defendant must show his counsel's performance was deficient, and second, he must show the deficiency prejudiced him. If Defendant cannot prove that a downward departure from the mandatory life sentence for first degree rape was warranted, he cannot prove prejudice. *State v. Monceaux*, 17-1052 (La.App. 3 Cir. 5/9/18), 2018 WL 2138289 (unpublished opinion). "To obtain a downward departure from a mandatory life sentence, Defendant must clearly and convincingly show that he is 'exceptional' by proving that the imposed sentence is not meaningfully tailored to his culpability, the gravity of the offense, and the circumstances of the case." *Id* at 6. As said earlier, Defendant has not presented any evidence to show that he is exceptional or that his sentence was not meaningfully tailored to the offense; therefore, Defendant has failed to prove that he deserves a downward departure. Further, the remarks of the trial court regarding the gravity of Defendant's crime, its impact on the victim, and the trial court's opinion that a life sentence was "justly deserved" indicate that even had counsel sought reconsideration, there is no reasonable probability that the same could have been granted. We find no merit to Defendant's second assignment of error.

Since the trial court was required to impose a mandatory sentence of life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence, the only viable ineffective assistance of counsel claim is that counsel failed to seek a downward departure from the mandatory life sentence required by La.R.S. 14:30.1. Defendant has not proven that a downward departure was warranted, and thus cannot prove prejudice. Defendant has not "clearly and convincingly show[n] that he is 'exceptional' by proving that the imposed sentence is not meaningfully tailored to his culpability, the gravity of the offense, and the circumstances of the case." *Griffin*, 351 So,3d at 390 (citing *Monceaux* at 6). The trial court gave a lengthy recitation of the facts of the case and the factors he considered in sentencing Defendant, remarking that justice demands that the

defendant be sentenced to life. Accordingly, as in *Griffin*, even had counsel argued for a downward departure, there is no reasonable probability that he would have been successful. This assignment of error lack merit, and we affirm Defendant's sentence.

## V.

## <u>CONCLUSION</u>

We find no merit to any of the arguments advanced by Defendant, Terrence Armstrong. Accordingly, we affirm both his conviction for the second degree murder of Edwin Davidson and the corresponding mandatory life sentence without the benefit of parole, probation, or suspension of sentence.

**AFFIRMED.**